Christopher D. Moon, SBN 246622
*chris@moonlawapc.com*
Kevin O. Moon, SBN 246792
*kevin@moonlawapc.com*
**MOON LAW APC**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 915-9432
Facsimile: (650) 618-0478

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDSAY PENHALL, on behalf of herself and a class of all others similarly situated,<br><br>     Plaintiff,<br><br>    v.<br><br>YOUNG LIVING ESSENTIAL OILS, LC,<br><br>     Defendant. | Case No.: **'19 CV 2340 JLS RBB**<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Lindsay Penhall, individually and on behalf of a class of persons similarly situated, brings this class action against Defendant Young Living Essential Oils, LC ("Young Living" or "Defendant") seeking equitable relief and damages as set forth below.

///

///

///

# I.

## NATURE OF THIS ACTION

1. Young Living purports to sell essential oils when, in reality, it sells a convincing lie—the irresistible promise of financial success and "generous, industry leading compensation" by joining its unlawful pyramid scheme.

2. Plaintiff Lindsay Penhall and hundreds of thousands of putative class members just like her, paid and lost hundreds (and in many cases thousands) of dollars to become Young Living distributors or "Members" based upon Defendant's false promise to "transform your financial future."

3. Of course, the promise of riches was simply the hook used to grow Young Living's base of recruits, which is the true purpose of the organization and the source of immense profits for Defendant—at the expense of its Members.

4. Young Living falsely represents to its Members that participation in Young Living—which necessarily requires hefty monthly payments—will result in material riches as long as they continue to solicit additional recruits to become Members of the Young Living family.

5. But that promise is nothing more than a pipe dream for Young Living's millions of Members. In reality, Defendant has created nothing more than an unlawful pyramid scheme—the cornerstone of which is Young Living's emphasis on new Member recruitment over the sale of its products.

6. Indeed, in 2016, the median monthly income of 94% of Members was $0 a month, and the average monthly income was a dismal $1 a month. But these amounts do not include the hundreds of dollars in costs Members incurred each year just to remain eligible to earn commissions. When these costs are accounted for, *at least 97.5% of Members lost money rather than earned money working for Young Living in 2016*. In fact, in 2016, the average Member *lost $1,175.*

7. And Members did not fare any better in 2018. Nearly 89% of Members earned on average $4 for the *year*. And, again, this does not include the

1    hundreds of dollars in costs incurred by Members to achieve that dismal $4 annual

2    income.  ***Similar to 2016, at least 96.7% of Members lost money in 2018 rather***

3    ***than earned money working for Young Living.***

4         8.     Through this class action, Plaintiff and the putative class seek to hold

5    Defendant accountable for its illegal and deleterious conduct, which has injured

6    hundreds of thousands of unwitting consumers who put their faith in Defendant's

7    empty promises.

8                               **II.**

9                      **<u>PARTIES</u>**

10        9.     Plaintiff Lindsay Penhall is a resident of San Diego, California. In

11    2018, Lindsay became a distributor (or "Member") of Young Living essential oils

12    after being recruited by another distributor.  Lindsay lost nearly $2,000 dollars

13    participating in the Young Living pyramid scheme.

14        10.     Defendant Young Living Essential Oils, LC is a Utah company with

15    its principal offices and headquarters located in Lehi, Utah.  Young Living claims

16    to "create abundance" for its Members.  In reality, Young Living creates

17    abundance only for itself through the unlawful operation of its vast pyramid

18    scheme.

19        11.     Plaintiff alleges, on information and belief, that at all times herein,

20    Defendant's agents, employees, representatives, executives, directors, partners,

21    and/or subsidiaries were acting within the course and scope of such agency,

22    employment, and representation, on behalf of Defendant.

23                             **III.**

24                 **<u>JURISDICTION</u>**

25        12.     This Court has original jurisdiction over this action pursuant to the

26    Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed

27    Class consists of 100 or more members; the amount in controversy exceeds

28    $5,000,000, exclusive of costs and interest; and minimal diversity exists.  This

Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## IV.

## **VENUE**

13.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  In addition, Plaintiff worked as a Young Living Member in this District.  Further, Defendant has purposefully availed itself of the California forum by intentionally directing its fraudulent pyramid scheme in California. Among other things, Defendant has a website presence that targets California residents like Lindsay; it sells and ships product to California Members like Lindsay; it markets its pyramid scheme in California; and it sponsors conferences and "Education Events" in California, where Members are encouraged to recruit new Members in furtherance of Defendant's illegal pyramid scheme.

## V.

## **FACTUAL ALLEGATIONS**

### A.    **Background**

14.    Founded in 1993 by Gary D. Young, Defendant claims to be the world leader in essential oils.  Defendant describes its essential oils as "aromatic, concentrated plant extracts that are carefully obtained through steam distillation, cold pressing, or resin tapping."

15.    Defendant's purported vision is to "bring Young Living Essential Oils to every home in the world."  Defendant's vision is also a lucrative one:  In 2017, sales of Defendant's more than 150 essential oils exceeded over **$1.5 billion**.  In addition, Defendant's revenues have increased over 800 percent over the last 6 years.

16.    Defendant also touts its purported values: "Always be honest. Young Living prides itself on strict compliance policies that keep us honest and

transparent. Acquiring these characteristics can help us continue to progress the company."  In addition, Defendant instructs its Members to "be sure to use good judgment[.]"

17.    But in practice, Defendant has fallen far short of upholding its self-professed values.  For example, Defendant's founder, Gary D. Young, was prosecuted for practicing medicine without a license.  Mr. Young also ran a now shuttered "Young Living Research Clinic" in Springville, Utah (subsequently replaced by a Young Living clinic in Ecuador) where he employed a quack physician convicted of manslaughter.  Mr. Young is also alleged to have nearly killed a patient through vitamin C infusions, which caused renal failure.

18.    Even more, in 2014, the U.S. Food and Drug Administration sent a warning letter to Defendant for falsely promoting its products as viable treatments for certain viral infections, including Ebola, Parkinson's disease, autism, diabetes, hypertension, cancer, multiple sclerosis, dementia, and other serious health issues.

19.    In 2017, Young Living pleaded guilty to federal charges and paid $760,000 for illegally trafficking certain oils in violation of the Lacey Act and the Endangered Species Act.  Utah's U.S. Attorney called Young Living's natural resource violations "substantial."

20.    In 2018, Young Living was ordered to pay $1.8 million for pursuing a lawsuit in bad faith against a competitor.

21.    But most pernicious of all is that Defendant's immense wealth is derived from a vast, illegal pyramid scheme that has caused countless unwitting victims to lose substantial sums of money.

**B.    How the Young Living Pyramid Scheme Works**

22.    Defendant sells "essential oils" via a complicated multilevel marketing ("MLM") operation.  The complex and intentionally hard-to-understand multi-layer compensation/participation structure of Young Living is a hallmark of

illegal MLM pyramid schemes.[1]

23.     While many consider every MLM company to be inherently fraudulent, the Federal Trade Commission ("FTC") has outlined guidelines it considers critical to distinguishing an illegal pyramid scheme from a "legitimate" MLM.  For example, a legal MLM program must structure its compensation so that the members are paid primarily based on sales of goods and/or services to those outside of the plan.  By contrast, an illegal pyramid scheme overwhelmingly rewards its participants for recruiting new members rather than through product sales made to persons outside the pyramid structure.

24.     In advising consumers about how to identify a pyramid scheme, the FTC stated, in relevant part:

> The promoters of a pyramid scheme may try to recruit you with pitches about what you'll earn. They may say you can change your life – quit your job and even get rich – by selling the company's products. . . . Often in a pyramid scheme, you'll be encouraged or even required to buy a certain amount of product at regular intervals, even if you already have more inventory than you can use or sell.  You may even have to buy products before you're eligible to be paid or get certain bonuses. . . . In addition, the company may say you can earn lavish rewards, like prizes, bonuses, exotic vacations, and luxury cars. However, it often turns out that you have to meet certain product purchase, recruitment, training, or other goals to qualify for the rewards, and only a handful of distributors ever qualify.[2]

25.     In addition, according to the California Department of Justice, "Millions of Americans have lost money in pyramid schemes. A pyramid scheme can take many forms, but generally involves the promise of making money by recruiting new people. Pyramid schemes are illegal, and most people lose

---

[1] *See* Exhibit A (Young Living's compensation plan); also available at (and more easily viewed given its formatting) https://static.youngliving.com/en-US/PDFS/compensation-plan.pdf.

[2] https://www.consumer.ftc.gov/articles/0065-multi-level-marketing-businesses-and-pyramid-schemes.

1    money."[3]

2        26.     Indeed, according Jon M. Taylor, MBA, Ph.D., who has extensively

3    studied and written about MLMs:

4        [T]o promote as a 'business opportunity' an endless chain or pyramid
5        selling activity (MLM) that in fact leads to almost certain loss for all but the
         founders and primary promoters (who are enriched from the purchases of
6        victims/recruits), is a misrepresentation of the facts, and can lead to the
7        defrauding of large numbers of participants. MLM is the epitome of the
         type of business activity the FTC[] is pledged to protect against – 'unfair
8        and deceptive acts or practices. . . . It is not just a few MLMs that are
9        conducting unfair and deceptive marketing practices, but virtually all of
         them, as all MLMs are built on a fundamentally flawed system of endless
10       chain recruitment of participants as primary customers.[4]

11

12       27.     Here, Defendant operates an illegal pyramid scheme because the

13   financial success of a Young Living Member is overwhelmingly dependent on the

14   recruitment of new people into the Young Living sales force—i.e., the defining

15   characteristic of an illegal pyramid scheme versus a legitimate MLM company.

16       28.     In addition, Young Living represents, either expressly or by

17   implication, that by becoming a Young Living distributor or Member, a person

18   will likely earn substantial income and/or achieve financial success—what Young

19   Living calls "abundance" or "income opportunity."  Young Living makes these

20   representations   through   a   variety   of   channels,   including   its   website,

21   "youngliving.com," print materials, videos, social media, live presentations,

22   events and trainings, income testimonials, and other means.

23       29.     Examples of the false and misleading representations Young Living

24   ────────────────────────

25   [3] https://oag.ca.gov/consumers/general/pyramid_schemes.

26   [4] Jon M. Taylor, MBA, Ph.D., Consumer Awareness Institute, *The Case (for and)
     against Multi-level Marketing*, 7-20, (2011), available at

27   https://www.ftc.gov/sites/default/files/documents/public_comments/trade-
     regulation-rule-disclosure-requirements-and-prohibitions-concerning-business-

28   opportunities-ftc.r511993-00008%C2%A0/00008-57281.pdf.

has made and makes to recruit new Members include the following from its website:

- "Have you ever wanted to truly own your time—and your life?  What if going to work every day was exciting and enjoyable, and you no longer had to wonder how you were going to pay the bills?  Young Living's generous compensation plan gives you the power to take control of your future and build a business that will change your life forever."

- "If you're ready to achieve your dream of independence and security, our generous, industry leading compensation plan will help you get there."

- "With a Young Living business, you're on a path to a different type of lifestyle—one with the potential to earn free products, transform your financial future, and bring life-changing solutions to homes around the world."

- "Every business needs a solid foundation.  With our Rising Star Team Bonus, you can achieve abundance as you progress from distributor all the way up to executive."

- "With dedicated support from Young Living and your team and a comprehensive compensation plan, you can take control of your future by building a rewarding business."

- "Young Living offers an industry-leading compensation plan with generous commissions and bonuses."

30.    Even more egregious, Young Living actually ***requires*** its Members to further its deception.  Specifically, Young Living requires that "[t]o qualify for compensation under Young Living's Compensation Plan . . . . [Members] have the responsibility to promote Young Living products **and the Young Living income opportunity**."[5]  The effect of which is that Young Living has engaged in a long-term advertising campaign that promoted—albeit misleadingly—that becoming a distributor of Young Living products will lead to financial success and/or

---

[5] *See Young Living's U.S. Policies and Procedures,* § 3.12.2 (2018).

meaningful income.

31.     Unfortunately, Young Living's very structure ensures that nearly every new Member will almost certainly lose large sums of money, chasing the elusive promise of "abundance" by trying to recruit additional new Members from an ever-shrinking pool of available candidates.

31.     And Young Living's Members' losses are compounded by its structure, which requires its Members to continuously purchase (and, as a result, hold) an ever-growing inventory of unused product, in direct violation of the 70/30 rule established in the FTC's seminal *Amway* ruling.[6]

### (1)     Young Living Encourages the Recruitment of Members over Retail Sales

32.     The Young Living compensation plan rewards the recruitment of new Members far more than the sale of product outside of the Pyramid.

33.     In describing the structure of its "generous, industry leading compensation plan," Defendant ***admits*** its compensation structure is designed to "help you build your business with compensation that **rewards you as you grow.**" Indeed, Defendant stated on its website:

> If you're ready to achieve your dream of independence and security, our generous, industry-leading compensation plan will help you get there. It's all about caring for our Young Living family, and another example of our commitment to total body wellness. Through our three-level approach, we've developed an efficient structure to help you build your business with compensation that rewards you as you grow.
>
> **1. Create a Foundation**
>
> Every business needs a solid foundation. With our Rising Star Team Bonus you can achieve abundance as you progress from distributor all the way up to executive.

*///*

---

[6]   *See Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979).

**2. Build Your Business**

Once you've seen the benefits of being your own business, you're ready to share that experience with others. Build on your foundation by adding others to your team to achieve shared success.

**3. Become a Leader**

With an established business and a passion for inspiring wellness through Young Living, you're ready to take the mission worldwide as you lead others to success.

34.     Notably absent from Defendant's message is any emphasis on selling product outside of the pyramid.

35.     To become a distributor of Young Living products and eligible for commissions, new Members must first purchase a "starter kit."   These kits range from "basic" ($35) to "premium" kits ($165)—however, the price can dramatically increase depending if additional options are selected.

36.     The vast majority of new Members opt for the premium kits, largely because the recruiters are actively encouraged by Young Living to push the premium kits over the basic kits and because certain bonuses are available if a new Member purchases a Premium Starter Kit.

37.     Once a new Member enrolls, Young Living pays a cash bonus to the "upline" Member who recruited the new "downline" Member to incentivize its existing Members to recruit as many new downline Members as possible.   And Young Living encourages recruiting new Members soon after a Member enrolls by providing certain recruiting bonuses called "Fast Start" bonuses only available during the first three months after a Member enrolls.

38.     The payment of the cash enrollment bonus, however, is not the only manner in which Members are actively and repeatedly encouraged to focus their efforts on the recruitment of new Members.   Indeed, Young Living's

compensation structure makes crystal clear that recruiting is prioritized over the sale of product in the Young Living system—to a fault.[7]

39.     As Members attempt to earn compensation through the Young Living system, their only opportunity to earn enough income to cover the cost of Membership is by recruiting new Members and then encouraging their downline Members to also recruit aggressively.

40.     To move up the pyramid and to be eligible to receive commissions, Young Living Members must also enroll in the Essential Rewards ("ER") program and maintain their active enrollment in ER by purchasing a minimum amount of Young Living products on a monthly basis, which is referred to as personal volume or "PV."

41.     Young Living gives each product a PV value, where each point is roughly equivalent to each dollar of goods purchased.  So a $10 product would typically have a PV value of 10.  To earn commissions on a downline, the minimum PV is 100.  In Lindsay's case, she purchased at least $100—often $300—of Young Living product each month in order to maintain her eligibility to earn commissions.

42.     The products that comprise a Member's PV are purchased at a 24% discount and, at least theoretically, can be resold by each Member, who could retain any difference between the discount and the retail price for which they might sell the product.

43.     Critically, however, is that there is no real incentive for a Member to try to become a reseller of oils as opposed to recruiting more downline members—for two important reasons.  First, there is no real opportunity for a Member to profit from becoming a reseller of oils at a mark-up because anyone can buy the oils at the discounted "wholesale" price directly from Young Living.

---

[7] *See* Exhibit A; https://static.youngliving.com/en-US/PDFS/compensation-plan.pdf.

Second, Members do not earn any commissions on the PV they purchase from Young Living.

44.     Instead, Members earn compensation in the form of commissions and bonuses only from (a) starter kits sold to newly recruited Young Living Members, and (b) the "Organization Group Volume," or "OGV," purchased by their downline Members either recruited personally by them or recruited by their downline Members.[8]

45.     More specifically, to qualify for commissions and/or to advance in rank, a Member must recruit new Members to become "Legs" in their downline—much like a branch in a family tree.  Each "Leg" must generate a certain "Leg Volume" through their own recruitment efforts.   And, under Defendant's "Unilevel Commission" structure, each level of new Member in a Member's downline can generate additional commissions for the Member—the effect of which is to further incentivize recruiting.  Therefore, a Member's compensation (commissions and bonuses) are all determined based on a Member's PV, Legs, Leg Volume and OGV—all of which are based on the recruitment of new Members.   Importantly, no Member can earn a commission except through recruitment.

46.     Even the Membership titles are intended to falsely convey to new Members the promise of wealth—such as "Gold," "Platinum," and potentially, the elusive rank of "Royal Crown Diamond."  The problem is, these higher tiers are virtually unattainable.   In order to move up the pyramid and share in the "abundance" of promised riches, a Member's required minimum OGV increases dramatically.  For example, in order to earn the relatively low rank of "Star," a new Member must have an OGV of 500, and the Member's minimum PV of 100 doesn't count towards the 500 OGV.  In other words, a Member is required to

---

[8] OGV is the total volume generated within a Member's organization.

CLASS ACTION COMPLAINT

recruit new Members to move up the pyramid and earn commissions. And because Members are not rewarded for additional PV purchased personally, the only conceivable way for a Member to move up in rank is by achieving the near impossible—i.e., the creation of a downline consisting of *thousands* of recruits.

47. Consider, for example, Young Living's highest rank of "Royal Crown Diamond." The required OGV is a staggering 1,500,000. In order to meet an OGV of 1,500,000, a Member would need a downline of more than 15,000 members each purchasing the minimum PV. Because attrition and failure to order minimum PV is not uncommon, it is likely a Member would actually need a downline consisting of many multiples of that number. Thus, it is not surprising that an infinitesimally small number of Members have ever actually achieved any meaningful success. Indeed, while Young Living brazenly touts the achievement of becoming a "Royal Crown Diamond" as within the grasp of all of its Members, a mere 46 have ever achieved this goal. Young Living claims it has 3,000,000 active Members, but does not report on the number of *former* Members. Thus, only .0015% of active Members have made it to the top of the pyramid, and the percentage of all Members is very likely much, much smaller.

48. And even more shocking is that Young Living doesn't even pay monetary commissions to most of those lucky few who are able to amass a downline that purchases the minimum level of OGV each month. To the contrary, if a Member's earned commission is less than $25 in a single month, Young Living will not pay that commission to the Member. Instead, Young Living issues a credit, which can be used by the Member only to buy more product. So, if a Member's OGV isn't large enough each month to trigger a commission check, his or her only option is to recruit even more Members in hopes of driving up OGV.

49. Defendant's singular focus on Member recruitment is further exemplified by its appropriately titled "On the Grow Tour," which is a series of "Education Events" held throughout the country. As part of the tour, Members

can participate in a "Grow Tour Challenge" where Members must enroll two new Members with a premium starter kit within a certain time period, as well as post certain information on social media to "encourage others to grow with you."  By doing so, a Member will "receive on-stage recognition for growing your team," as well as a gift.

50.     In short, this is not a system designed to sell product to those outside the pyramid.  Rather, the entire system is designed for one purpose: to recruit new Members to grow the illegal pyramid, which only benefits Defendant and those very few Members at the top.

51.     Indeed, financial success remains elusive to nearly all Members.  In 2016, the median monthly income of 94% of Members was $0 a month, and the average monthly income was a dismal $1 a month!  But these amounts do **not** include the hundreds of dollars in costs Members incur each year to remain eligible to earn commissions downline.  When these costs are accounted for, ***at least 97.5% of Members lost money rather than earned money working for Young Living in 2016.***[9]  In fact, in 2016, the average Member ***lost $1,175.***

52.     Members did not fare any better in 2018.  Nearly 89% of Members earned on average $4 for the ***year***.  And, again, this does not include the hundreds of dollars in costs incurred by Members to achieve that dismal $4 annual income. ***Similar to 2016, at least 96.7% of Members lost money rather than earned money working for Young Living.***[10]   *See also* https://www.ftc.gov/news-events/press-releases/2019/10/multi-level-marketer-advocare-will-pay-150-million-settle-ftc (The FTC alleged that Advocare operated an illegal pyramid

---

[9]   Specifically, according to Defendant's 2016 Income Disclosure, the average yearly income of 97.5% of Members did not cover the minimum yearly costs to remain eligible to earn commissions and bonuses.
[10]   Specifically, according to Defendant's 2018 Income Disclosure, the average annual income of 96.7% of Members did not cover the minimum annual cost to remain eligible to earn commissions and bonuses.

scheme and "AdvoCare did not offer consumers a viable path to financial freedom. In 2016, 72.3 percent of distributors did not earn any compensation from AdvoCare; another 18 percent earned between one cent and $250; and another 6 percent earned between $250 and $1,000. The annual earnings distribution was nearly identical for 2012 through 2015.").

53.    Moreover, even the smaller-than-promised potential incomes described herein do not account for the significant additional outlays of time and money that Members are forced to incur just to maintain their business, including traveling around the country to Young Living conferences or meetings, and organizing their own sales events.  In addition, since Members are not classified as employees but as independent contractors of Young Living, Members are responsible for paying self-employment taxes and for their own health insurance or other typical job-related benefits.

54.    This is not "abundance."  Rather, this is the very definition of an illegal pyramid scheme.  And Defendant's misleading and deceptive representations concerning a consumer's ability to earn income does not only violate Defendant's self-professed values—it's unlawful.

55.    Plaintiff and Class Members relied on Defendant's material misrepresentations concerning the income opportunity and/or financial success a consumer can achieve by becoming a Young Living distributor.

56.    And, as described herein, Defendant willfully failed to disclose and continues to fail to disclose that the program's structure ensures that most Members will not earn any—much less meaningful—income.

57.    In addition, Defendant willfully failed to and continues to fail to adequately disclose its appalling—and certainly material—income statistics.

58.    Further, Defendant willfully failed to disclose and continues to fail to disclose that it operates an illegal pyramid scheme.

59.    Had Plaintiff and reasonable consumers known that Defendant was

1    operating an illegal pyramid scheme and/or had they known that nearly all
2    Members lose money rather than make money, they would not have become
3    Members or would have acted differently.

4         60.    Unfortunately, Plaintiff and Class Members have suffered an injury
5    in fact and have lost money because of Defendant's unlawful misrepresentations
6    and omissions.

7              **(2)    Young Living Members are Encouraged to Violate the**
8                       **70/30 Amway Rule**

9         61.    Beyond Young Living's overwhelming dependence on recruitment
10   income, Young Living's status as an unlawful pyramid scheme is further
11   evidenced by its brazen violation of the so-called 70/30 rule.  In the FTC's 1979
12   *Amway* ruling, it concluded that Amway did not operate as a pyramid scheme, in
13   part, because Amway required its representatives to submit proof of resale
14   demonstrating no more than 30% of purchased product was for personal use or
15   storage before permitting its representatives to purchase additional product—thus
16   the term "70/30." *See Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979)

17        62.    The 70/30 rule is designed to prevent an MLM from encouraging its
18   members to continuously order new product for sale (sometimes referred to as
19   "inventory loading") in order to be eligible to earn commissions.  Here, Young
20   Living's compensation system actually requires its Members to inventory load
21   product.  If a Member fails to meet his or her minimum monthly PV, he or she is
22   not eligible to earn any commissions on his or her downline's OGV no matter how
23   large that OGV may be.

24        63.    Young Living is well aware of the 70/30 rule. Its policies and
25   guidelines even say that no more than 30% of ordered PV can be stored prior to
26   purchasing additional inventory.  But this is mere lip-service.  Young Living does
27   absolutely nothing to enforce this policy and is well-aware that it is routinely
28   violated.  Young Living has no method of compliance in place, and it requires no

1 proof that its Members are actually selling their PV.  Any Member can order as

2 much PV as he or she wants, whenever he or she wants.  And Young Living turns

3 a blind eye, because doing so helps further its scheme.

4     64.    And, unlike MLMs that sell physically large products, which impedes

5 inventory loading, the opposite is true of Young Living's products. Young

6 Living's oils are contained in small, easily stored vials, which actually facilitate

7 inventory loading.  Most vials contain only 5 ML to 15 ML of product and each

8 one can sell for $20 or more.  At that size and price, a single closet shelf would be

9 enough space for a failing Young Living Member to store literally thousands of

10 dollars in unsold product, hoping against hope that his or her downline OGV will

11 grow large enough to trigger a meager commission.

12 **(3)    Young Living Is an Illegal Pyramid Scheme**

13     65.    By any measure, Young Living is unequivocally a pyramid scheme.

14     66.    Numerous government agencies, legal opinions and experts have all

15 recognized that MLM companies—like Young Living—which emphasize member

16 recruitment over product sales, earn the majority of their revenue from member

17 recruitment, and make no effort to enforce the "70/30" rule, are in fact illegal

18 pyramid schemes.[11]

19     67.    Indeed, in 2015, the FTC sued Arizona-based Vemma Nutrition

20 Company in the District Court of Arizona for running an illegal pyramid scheme

21 utilizing a very similar pay structure and model utilized by Young Living.[12]

22     68.    In December 2016, Vemma admitted it was running an illegal

23 pyramid scheme and agreed to a judgment that included $238 million in monetary

24 _____

25 [11]  *See e.g., Stull v. YTB Intern., Inc.*, CIV. 10-600-GPM, 2011 WL 4476419, *5

26 (S.D. Ill. Sept. 26, 2011) (noting the fact that travel-based pyramid scheme's revenues were largely derived from new recruits supported allegation it was a

27 pyramid scheme).

28 [12]  *See FTC v. Vemma Nutrition Co.*, *et al.*, 15 CV 01578 – PHX (D. Ariz.) (ECF No. 1).

damages, as well as an injunction that prohibits Vemma from, *inter alia,* engaging in the very same acts which the Defendant is engaging here.[13]

69.    According to the FTC:

[Vemma,] [t]he multi-level marketing (MLM) company[] which sells health and wellness drinks through a network of distributors called "affiliates," will be prohibited under a federal court order from paying an affiliate unless a majority of that affiliate's revenue comes from sales to real customers rather than other distributors. The order also bars Vemma from making deceptive income claims and unsubstantiated health claims.

"Unfortunately, extravagant income claims and compensation plans that reward recruiting over sales continue to plague the MLM industry," said Jessica Rich, Director of the FTC's Bureau of Consumer Protection. "MLM companies must ensure that their promotional materials aren't misleading, and that their compensation programs focus on selling goods or services to customers who really want them, not on recruiting more distributors."[14]

70.    Specifically (and just like Vemma), the overwhelming majority of distributors will not even recoup the money that they paid to Young Living to become a Member and be part of Young Living's sales force.

71.    Conversely (and just like Vemma), Young Living's enormous revenue is largely based on the money it receives from its own distributors to be part of the sales force, and the products its sales force are required to purchase.[15]

72.    Federal and state courts across the country have recognized that the

---

[13] *See* FTC Release "Vemma Agrees to Ban on Pyramid Scheme Practices to Settle FTC Charges."   https://www.ftc.gov/news-events/press-releases/2016/12/vemma-agrees-ban-pyramid-scheme-practices-settle-ftc-charges.
[14] *Id.*
[15] *See also* https://www.ftc.gov/news-events/press-releases/2019/10/multi-level-marketer-advocare-will-pay-150-million-settle-ftc (On October 2, 2019, "Multi-level marketer AdvoCare International, L.P. and its former chief executive officer agreed to pay $150 million and be banned from the multi-level marketing business to resolve Federal Trade Commission charges that the company operated an illegal pyramid scheme that deceived consumers into believing they could earn significant income as 'distributors' of its health and wellness products.");

operation of a pyramid scheme such as Young Living constitutes fraud.  Pyramid schemes make money for those at the top of the pyramid and victimize those at the bottom who cannot find recruits. Accordingly, pyramid schemes are inherently fraudulent.  Defendant's operations are also a pyramid scheme because they are based on false promises of vast financial rewards, which are impossible to achieve for new Members who enter at the bottom of the pyramid and who have no realistic chance of moving up the ladder.

73.     Ultimately, the Members are financially induced by Defendant to recruit new distributors to join the sales force through materially false representations and omissions concerning the Young Living pyramid scheme.  By emphasizing recruitment over product sales, Young Living easily crosses the threshold from legitimate MLM into an illegal pyramid scheme.

74.     The rewards that Members can achieve in this case are dependent on virtually endless recruitment into the scheme in which people are exploited and have virtually no chance to get a return on their investment, let alone achieve the high financial gains that Defendant induced these representatives to believe they would achieve.

**C.     Plaintiff's Experience Confirms Young Living Is a Pyramid Scheme**

75.     In May 2018, Plaintiff Lindsay Penhall joined Young Living as a distributor (or Member) after learning about it from another Young Living Member.  Lindsay worked as a Young Living distributor from May to December 2018.

76.     In deciding to become a Young Living Member, Lindsay relied on Young Living's material misrepresentations concerning the financial success she would likely achieve by becoming a distributor of Defendant's essential oils. Specifically, Lindsay believed she would earn significant income through recruiting others to become Young Living Members and part of her downline.

77. To join Young Living, Lindsay purchased a premium starter kit and approximately $300 worth of essential oils. Thereafter, Lindsay began making monthly payments to Young Living in order to satisfy her PV requirement and to ensure she could receive the potential commissions of her downline.

78. Of course, like the overwhelming majority of Members, Lindsay found recruitment difficult, notwithstanding the fact that Lindsay expended considerable time and money in her recruitment efforts. Indeed, Lindsay organized classes, giveaways, and other recruiting events to which she invited friends and others in an attempt to recruit new Members. Lindsay even constructed a display of Young Living products at the store where she worked and spoke with numerous customers about Young Living products in an effort to recruit new Members. Notwithstanding her efforts, between May and December of 2018, Lindsay was only able to recruit two new Members.

79. Yet, during that time, Lindsay bought product month after month even though she didn't need it and had no hope of re-selling it to someone else. Moreover, Young Living never questioned whether Lindsay was re-selling at least 70% of her purchases.

80. By the time Lindsay realized she had been victimized by Young Living, she had purchased approximately $2,150 of product, but had only "earned" commissions of approximately $300 from her downline. Accordingly, Lindsay did not receive the benefit of her bargain and suffered an injury in fact.

81. Lindsay describes her experience working as a Young Living distributor as extremely stressful. But Lindsay's experience is hardly an aberration; rather, it is typical of the experience of most Young Living Members.

82. Had Young Living disclosed to Lindsay that most Members lose money rather than earn money, Lindsay would never have become a Young Living distributor. Similarly, had Young Living disclosed that it was an illegal

pyramid scheme, Lindsay would not have become a distributor. And, had Young Living not misrepresented the financial success Lindsay was likely to achieve and/or the "income opportunity," Lindsay would not have become a distributor.

## VI.

## CLASS ACTION ALLEGATIONS

83.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and all others similarly situated, and as a member of the Classes defined as follows:

**All residents of the United States who, within the relevant statute of limitations periods, were Young Living distributors ("Nationwide Class"); and**

**All residents of California who, within four years prior to the filing of this Complaint, were Young Living distributors ("California Subclass")**

("Nationwide Class" and "California Subclass," collectively, "Class").

84.   Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (iv) all persons presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (v) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

85.   Plaintiff reserves the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

86.   This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 for the reasons set forth below.

87.     **Numerosity:** Members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the Nationwide Class consists of hundreds of thousands of Members (if not more) dispersed throughout the United States, and the California Subclass likewise consists of tens of thousands of Members (if not more) dispersed throughout the State of California.  Accordingly, it would be impracticable to join all members of the Class before the Court.

88.     **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues.  Included within the common questions of law or fact are:

a.      Whether Defendant engaged in unlawful, unfair or deceptive business practices;

b.      Whether Defendant violated California Bus. & Prof. Code § 17200, *et seq.*;

c.      Whether Defendant violated Cal. Bus. & Prof. Code § 17500, *et seq.;*

d.      Whether Defendant was operating an unlawful pyramid scheme;

e.      Whether Defendant was operating an unlawful endless chain under California state law.

f.      Whether Defendant fraudulently omitted and otherwise failed to inform Plaintiff and the Class that they were entering into an unlawful scheme where an overwhelming number of participants lose money;

k.      Whether Defendant negligently misrepresented the income opportunity and/or financial success Class Members would achieve by becoming a Young Living Member.

l.      Whether Plaintiff and the Class are entitled to equitable and/or

injunctive relief;

m.    Whether Plaintiff and the Class have sustained damages as a result of Defendant's unlawful conduct;

n.    The proper measure of damages sustained by Plaintiff and Class Members; and

o.    Whether Defendant was unjustly enriched by its unlawful conduct.

89.    **Typicality**:  Plaintiff's claims are typical of the claims of the Class Members they seek to represent because Plaintiff, like the Class Members, participated in Defendant's misleading and deceptive practices, and Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct.  Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

90.    **Adequacy**: Plaintiff is an adequate representative of the Class she seeks to represent because her interests do not conflict with the interests of the Class Members Plaintiff seeks to represent.  Plaintiff will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions.

91.    **Superiority and Substantial Benefit:** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

a.    The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

b.    Absent a Class, the members of the Class will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

c.    Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

d.    When the liability of Defendant has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

e.    This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by Defendant.

92.    Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

93.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

94.    Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**COUNT I**</u>

**Endless Chain Scheme**

**(California Penal Code § 327 and California Civil Code § 1689.2)**

(***On Behalf of the California Subclass***)

95.    Plaintiff repeats and re-alleges the allegations made throughout this Complaint as if fully set forth herein.

96.    Plaintiff brings this claim individually and on behalf of the California Subclass.

97.    California Penal Code § 327 renders endless chain schemes illegal. Section 1689.2 of the California Civil Code provides:

> A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

98.    Defendant is operating an endless chain scheme, as described herein.

99.    Plaintiff and the California Subclass have suffered an injury in fact and have lost money because of Defendant's business acts, omissions, and practices.

100.   Plaintiff and the California Subclass are entitled to recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme.

101.   A violation of California Penal Code § 327 can be punishable by imprisonment for up to three years in state prison.

<u>**COUNT II**</u>

**Unfair and Unlawful Business Acts and Practices**

**(California Business and Professions Code § 17200, *et seq*.)**

(***On Behalf of the California Subclass***)

102.   Plaintiff repeats and re-alleges the allegations made throughout this

-25-
CLASS ACTION COMPLAINT

1  Complaint as if fully set forth herein.

2  103.  Plaintiff brings this claim individually and on behalf of the California

3  Subclass.

4  104.  Defendant engaged in continuous illegal, unfair, and fraudulent

5  business acts or practices, and unfair, deceptive, false and misleading advertising

6  within the meaning of the California Business and Professions Code § 17200, *et.*

7  *seq.*  The acts or practices alleged herein constitute a pattern of behavior, pursued

8  as a wrongful business practice, that has victimized and continues to victimize

9  thousands of consumers.

10  105.  Under California Business and Professions Code § 17200, an

11  "unlawful" business practice violates California law.  Defendant's business

12  practices are illegal because they involve the creation and promotion of an illegal

13  pyramid scheme or "endless chain" under California law.  Defendant is engaged in

14  an illegal pyramid scheme or "endless chain" as defined under California Penal

15  Code § 327.  Defendant utilizes this illegal pyramid scheme with the intent,

16  directly or indirectly to dispose of property, in Young Living products, and to

17  convince Members to recruit others to do the same.

18  106.  Under California Business and Professions Code § 17200, an "unfair"

19  business practice includes a practice that offends an established public policy, or

20  that is immoral, unethical, oppressive, unscrupulous or substantially injurious to

21  consumers.  Defendant's promotion and operation of an illegal pyramid scheme is

22  unethical, oppressive, and unscrupulous in that Defendant is duping consumers out

23  of vast sums of money through the illegal pyramid scheme.

24  107.  Under California Business and Professions Code § 17200, a

25  "fraudulent" business practice is likely to deceive the public.  Defendant's business

26  practice is fraudulent in that Defendant has deceived and continued to deceive the

27  public by misrepresenting their business.  Defendant has made numerous

28  misrepresentations and material omissions regarding the income a Member can

realize and the financial success a Member can achieve, and Defendant has failed to inform consumers that they are operating an illegal pyramid scheme where nearly all Members will lose money rather than make money.  Plaintiff and the California Subclass have relied on and continue to rely on Defendant's misrepresentations and omissions to their detriment.

108.  Because of these unlawful acts, Defendant has reaped and continues to reap unfair benefits and illegal profits at the expense of Plaintiff and the California Subclass.  Defendant should be made to disgorge these ill-gotten gains and return to Plaintiff and the California Subclass the wrongfully taken revenue.

109.  Defendant's unlawful, unfair, and fraudulent acts and omissions will not cease without injunctive relief being provided.  Under California Business and Professions Code § 17203, Plaintiff seeks equitable and injunctive relief to stop Defendant's misconduct, as complained of herein, including, but not limited to, an order declaring such misconduct to be unlawful, unfair, fraudulent, and/or deceptive, and enjoining Defendant from undertaking any further unfair, unlawful, fraudulent, and/or deceptive acts or omissions relate to operating the illegal pyramid scheme.

## COUNT III

### Deceptive Advertising Practices

### (California Business and Professions Code § 17500, *et seq.*)

### (*On Behalf of the California Subclass*)

110.  Plaintiff repeats and re-alleges the allegations made throughout this Complaint as if fully set forth herein.

111.  Plaintiff brings this claim individually and on behalf of the California Subclass.

112.  California Business & Professions Code § 17500 prohibits "unfair, deceptive, untrue or misleading advertising[.]"

113.  Defendant's business acts, false advertisements and materially

1  misleading omissions constitute unfair trade practices and false advertising, in
2  violation of the California Business and Professions Code § 17500, *et. seq*.

3  114. Defendant engaged in and continues to engage in false, unfair, and
4  misleading business practices consisting of false advertising and materially
5  misleading omissions likely to deceive the public and include, but are not limited
6  to:

7  a. Defendant failing to disclose to Class Members that they were
8  entering into an illegal pyramid scheme;

9  b. Defendant misrepresenting the income opportunity and/or
10 financial success a Class Member would achieve; and

11 c. Defendant failing to disclose to Class Members that the vast
12 majority would lose money rather than earn money.

13 115. Defendant's marketing and promotion of the illegal pyramid scheme
14 constitutes misleading, unfair, and fraudulent advertising in connection with its
15 false advertising to induce consumers to purchase products and join the illegal
16 pyramid scheme. Defendant knew or should have known, in exercising reasonable
17 care, that the statements it was making were untrue or misleading and deceived
18 members of the public. Defendant knew or should have known, in exercising
19 reasonable care, that Members, including Plaintiff, would rely, and relied on
20 Defendant's misrepresentations and omissions.

21 116. Because of Defendant's untrue and misleading representations,
22 Defendant wrongfully acquired money from Plaintiff and the California Subclass
23 to which it was not entitled. Accordingly, the Court should order Defendant to
24 disgorge, for the benefit of Plaintiff and the Class, its profits and compensation
25 and/or make restitution to Plaintiff and the Class.

26 117. Under California Business and Professions Code § 17535, Plaintiff
27 and the California Subclass seek a judicial order directing Defendant to cease and
28 desist with all false advertising related to Defendant's illegal pyramid scheme and

such other injunctive relief as the Court finds just and appropriate.

118.   Pursuant to Civil Code § 3287(a), Plaintiff and the California Subclass are further entitled to pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct.  The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the California Subclass are entitled to interest in an amount according to proof.

## COUNT IV

### Fraudulent Omission

### (Cal. Civ. Code §§ 1709-1710 and California Common Law)

### *(On Behalf of the California Subclass)*

119.   Plaintiff repeats and re-alleges the allegations made throughout this Complaint as if fully set forth herein.

120.   Plaintiff brings this claim individually and on behalf of the California Subclass.

121.   Plaintiff brings this claim pursuant to California Civil Code §§ 1709-1710, et seq., and pursuant to California common law.

122.   This claim is based on fraudulent omissions concerning Defendant's illegal pyramid scheme.  Defendant actively concealed material facts, in whole or in part, with the intent to induce Plaintiff and the Class to join Defendant's illegal pyramid scheme.

123.   As discussed herein, and among other things, Defendant failed to disclose to Class Members that they were entering into an illegal pyramid scheme, and that the vast majority of Class Members would lose money rather than earn money.  Moreover, Defendant failed to adequately disclose its appalling—and certainly material—income statistics to Class Members.

124.   The false and misleading omissions were made with knowledge of their falsehood.

125.   Defendant knew the omitted information was material and was

information Class Members would have wanted to know in making a decision to become a Young Living distributor.

126. In addition, Defendant could easily have disclosed the omitted information through the many different channels Defendant uses to disseminate information, as described herein, including on the various pages of Defendant's website through which consumers enroll to become Members.

127. Nonetheless, Defendant continued to encourage consumers to become Members of the illegal pyramid scheme without disclosing and actively concealing this material information.

128. The false and misleading omissions were made by Defendant, upon which Plaintiff and Class Members reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and Class Members to become Young Living Members.

129. Plaintiffs and the Class were unaware of these omitted material facts and would not have become Young Living distributors had they known them.

130. Plaintiff and the Class suffered injuries that were proximately caused by Defendant's active concealments and omissions of material facts.

## COUNT V

### Negligent Misrepresentation

### (Cal. Civ. Code §§ 1709-1710 and California Common Law)

### *(On Behalf of the California Subclass)*

131. Plaintiff repeats and re-alleges the allegations made throughout this Complaint as if fully set forth herein.

132. Plaintiff brings this claim individually and on behalf of the California Subclass.

133. Plaintiff brings this claim pursuant to California Civil Code §§ 1709-1710, et seq. and pursuant to California common law.

134. As described in more detail herein, Defendant negligently

misrepresented material facts concerning the income opportunity and/or financial success that a Class Member would achieve by becoming a Young Living distributor, and/or that Young Living was a legitimate—and lawful—multilevel marketing company as opposed to an illegal pyramid scheme.

135.   Plaintiff and Class Members were unaware of the falsity of Defendant's misrepresentations and, as a result, justifiably relied on them when making the decision to become Young Living distributors.

136.   Defendant knew or should have known that Plaintiff and Class Members would not have realized the truth of Defendant's negligent misrepresentations.

137.   Defendant was in a superior position than Plaintiff and the Class such that reliance by Plaintiff and the Class on Defendant's misrepresentations was justified.   Defendant possessed the skills and expertise to know the type of information that would influence a consumer's decision to become a distributor.

## COUNT VI

### Unjust Enrichment

### *(On Behalf of the Nationwide Class and California Subclass)*

137.   Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

138.   Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass.

139.   By becoming a Member, Plaintiff and the Class conferred a benefit on Defendant in the form of monetary payments made to Defendant.

140.   Defendant had knowledge of such benefits.

141.   Defendant appreciated the benefit because, were consumers not to become Members, Defendant would not generate substantial revenues and profits.

142.   Defendant's acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent conduct.

143. Equity cannot in good conscience permit Defendant to be economically enriched for such actions at the expense of Plaintiff and the Class, and therefore restitution and/or disgorgement of such economic enrichment is required.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the putative Class pray for judgment against Defendant as follows:

1. For an order certifying the Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representatives of the Nationwide Class and California Subclass; and naming Plaintiff's attorneys as Class Counsel to represent the Nationwide Class and California Subclass;

2. A judgment against Defendant;

3. For an order declaring that Defendant's conduct violates the statutes and laws referenced herein;

4. Rescission of the agreements upon which the scheme is based, and recovery of all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme;

5. For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Class for all causes of action;

6. Temporary and permanent injunctive relief enjoining Defendant from further unfair, unlawful, fraudulent and/or deceptive acts, including but not limited to supporting the pyramid scheme;

7. The costs of investigation and litigation reasonably incurred, as well as attorneys' fees;

8. For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Class, hereby demands a trial by jury as to all matters so triable.

Dated:  December 6, 2019          **MOON LAW APC**

By:

_____
CHRISTOPHER D. MOON
KEVIN O. MOON
Attorneys for Plaintiff